Southern Appalachian Mountain Stewards v. A & G Coal Corporation Good morning. My name is A.J. Dudley. I am here on behalf of the Appellant A & G Coal Corporation. Seated with me at council table is Dustin Dean, an associate general counsel who works with me in Roanoke, Virginia. I am here today asking this panel to reverse a grant of summary judgment issued in favor of the Appalese. And the reason is because there is a genuine issue of material fact that remains as to whether A & G met its disclosure obligations under the Clean Water Act and whether and what the permitting agency knew and had within its reasonable contemplation, specifically the element of selenium. I think there are two main themes here. One speaks to the preservation of this Court's Piney Run decision from a legal perspective. And secondly, what in the record does demonstrate the more than scintilla of evidence, of information, that would generate the genuine issue of material fact. As to that first prong, we are asking that this Court affirm Piney Run and its legal parameters. I would like to point out that Piney Run basically says the permit shield afforded by the Clean Water Act shields a permittee from liability as long as the permit holder complies with the express terms of the permit and Clean Water Act disclosure requirements and the permit holder does not make a discharge of pollutants not within the reasonable contemplation of the permitting authority at the time the permit was granted. The lower court's ruling stated, and I quote, I hold that a permittee must have actually disclosed a pollutant in its permit application in order to avail itself of the permit shield. That is at page 511 of the joint appendix. With respect to the District Court, that is not the legal requirements of Piney Run. Piney Run actually tells us that the permit that the pollutant, excuse me, at issue in that case, which was heat, came from testimony. The evidence that the agency had heat in its reasonable contemplation came from testimony. There is no indication that that pollutant, heat, was in the written application associated with Piney Run's Clean Water Act permit. It wasn't in the permit itself. So in order to adopt the District Court's legal ruling that the pollutant must be in the application itself would be to require an overruling of Piney Run or a completely narrow, a very narrow construction of Piney Run. Even if we assume that the District Court overstated the thrust of Piney Run in the section that you described on page 511, it does come back on the next page and acknowledge the second problem, which you introduced earlier, and say that there's no evidence that the agency reasonably contemplated the discharge of selenium. So it does seem, you know, the record demonstrates at least four examples of information and evidence that selenium was within the agency's reasonable contemplation. And those four pieces of evidence would generate more than a scintilla to justify denial reversal on the basis of denying the summary judgment. Speaking of those four pieces of information, first I direct the panel to Joint Appendix pages 80 and 81. That is an interrogatory response by the appellees. And the question there was whether they had any information to indicate A&G Coal knew or had reason to expect there would be selenium discharges from this particular mine site. And in response to that question on page 81 of the Joint Appendix, the appellees state, there is a publicly available 1981 core sample from near the subject outfalls, indicating high selenium levels within the Taggart Coal seam. Such information was publicly available and was therefore available to A&G. Aren't you just flipping the clean water, turning the statute on its head when you say, you know, this should have been within DMME's reasonable contemplation when it issues the permit, but isn't it your job to bring things to the permitting agency rather than sort of having the permitting agency, oh, well, it should have known this, it should have known that? And if DMME reasonably should have contemplated it, why wouldn't you? Why shouldn't you have been aware of it and disclosed it? Your Honor, speaking to the first prong of your comments, I think that the key principle here is what does the permitting agency know? They are the ones who draft the permit. They are the ones who write the permit. Why isn't the key concept not what the permitting agency knows, but what you, in fact, disclose? Well, if you think about that, that would mean that the permitting agency is only an expertise as to what an applicant tells them. And that is not exactly the way the Clean Water Act is supposed to work. They are the experts. They are the ones that are allowed to go back and forth. You are the ones that are running the mine. You are the one that is charged with the duty of sampling. What troubles me is that you are saying we don't have to disclose anything about this pollutant and we discharge unlimited amounts of it. Your Honor. You know, that, to me, just tears a complete hole in the Clean Water Act scheme. Your Honor, speaking of that scheme, I think of the application process that Piney Run speaks to. And part of the process includes application instructions. And on Joint Appendix page 356, there is an instruction that does say for 15 different elements, you are to attach a certificate of analysis or reference appropriate information on file at the division. Thus far, no one seems to have fixated on what or reference appropriate information on file at the division may mean. But certainly, it is broad enough to have captured what was offered to the trial court in the form of the 1997 letter from the EPA to DMME. Is that the letter that the court did not allow in because of the passage of time? That is that letter. Yes, sir. So, if we assume the district court was correct in its procedural rule on that one, what is your best evidence that there exists in the record a pre-existing knowledge by the agency that there was selenium at this mine? Getting back to the interrogatory response, I think that SAMS has, we call them SAMS, South Appalachian Mountain Stewards. If SAMS has taken the position that this 1981 core sample in the general geographic area, not even at this mine site, if they take the position that that was sufficient to put A and G, make A and G aware of selenium in the general area, it is certainly fair to say it is also information that would indicate that that would be within the agency's reasonable contemplation. In fact, I would submit it is less of a leap. I thought the whole company's argument was that we never knew this stuff was here. And the rejoinder from the agency or the interest group here is that, well, if you didn't know about it, why would it be rational to expect us to have somehow taken notice of it? Because what the applicant is expected to do is talk about what it knows about at that location from SAMS saying, well, you should have known about selenium on this mine site because of selenium nearby. That same principle applies to the permitting agency as well. In fact, like I was going to suggest, that is less of a leap. I mean, who would be in a better position to know about a 1981 core sample in the geographic area than the permitting agency itself? Wouldn't you be required, though, or would the district court be required under the Clean Water Act to have proof that the agency did know? Your Honor, I think at this point the standard of summary judgment becomes important. I do think at trial, and we would be prepared to prove at trial exactly what the agency knew. I don't understand what the problem with the summary judgment grant was because it's undisputed that selenium is a pollutant. You know that. We all know that. At a minimum, it's dangerous at high levels through aquatic life and who knows what else. It's undisputed that you're discharging this pollutant. It's undisputed that the permit gives you no permission to discharge selenium. And it's undisputed that the selenium pollutant was never so much as disclosed. Those are undisputed facts. They go to how the permitting process is supposed to operate. And did you even sample your outflow? Your Honor, I know there has been sampling conducted. At this mine site, was there sampling? There is now. Well, I'm talking about prior to the permit application. Your Honor, there certainly is nothing in the record that would indicate that there was that type of sampling. Well, it assumes you have some obligation to sample your outflow so that you can, at the particular mine site, so that you can put that in the permit application. What I'm worried about is we're establishing all sorts of incentives for willful blindness. And we're establishing incentives not to disclose pollutants. Your Honor, I think that in that, to respond to that comment, I think you have to think about how the process works. EPA, of course, allows DMME to be the permitting regulatory agency. They provide the applicant with an application. And the application does, it's very clear what the language says. It says, you know, you need to provide analyses for these 15 different elements, one of which is selenium, or reference appropriate information on file at the division. And I would suggest to the Court that for a summary judgment purpose, an inference can be made. How can an application that, according to the United States, and according to SAMS, is so fatal on its face, in other words, not only does it not provide the analyses, it doesn't say anything about it. It doesn't say not applicable. It doesn't say I refuse to answer this question. I mean, it's completely silent. How, then, did the permitting agency, nonetheless, grant the permit? But don't federal regulations, Virginia regulations, and the permit application process require some sampling of the discharge prior to application? They do. They do. And that speaks to the 1997 letter, which I think addresses how EPA authorized the state permitting agency to interpret the application instruction-related regulations. And that letter says if you want to do the sampling basically on behalf of these applicants, these companies, those companies was the phrase, you can do that. But you have to have some indication on your application that that's what you're doing. And I would submit that all reference appropriate information on file at the division is some indication that that is how DMME is going to implement, per permission from EPA in the 1997 letter, the testing that Your Honor is asking about. It is required for those 15 elements listed on that table and listed in Section 8 of the application. The Department of Justice, in this case, has filed a brief indicating that this two-prong test is not really a conjunctive one, but rather a conjunctive one. And if you fail the first part, as it seems clear, it appears from the record that you did, at least that's the argument of your opponents, that that's the end of the matter. We don't get the contemplation of what the permitting authority knew or didn't know because you failed in your primary obligation to either disclose expressly or to sample and comply with the other disclosure requirements. Do you agree with that? I do not agree with that because I think the Clean Water Act has to have as a basic tenet, what does the permitting author know? What is within the reasonable contemplation of the agency? I think we can all agree that there could be things the permitting agency, as experts, are going to know about that an applicant may not know about. And they're especially going to know about it when we're faced with an application that on its face is silent as to 15 important elements that are laid out by name. So why would the permitting agency have gone ahead and granted that permit in the face of that application? That's because they know something. That's because it is within their reasonable contemplation, despite the fact that you don't see it on the face of the application. It seems like that's a fairly significant assumption or speculation on your part. You would have had to have tendered, it seems to me, some sort of evidence going into the summary judgment proceeding. That was a clear indication that the agency was aware at that site there was selection. Your Honor, not to quarrel with that, but I don't know if we would have had to do that it was clear because if it was clear, I think we would be entitled to summary judgment. I think if it was absolutely clear that they had it in their reasonable contemplation, she would be on the other foot. I think for purposes of questioning whether there were It was clear in the sense that it created a material question of fact that would have prohibited summary judgment at that point. I see my time's up if I may respond to your question. Your Honor, I think that their evidence in the record is sufficient to meet the more than a scintilla standard on summary judgment, drawing all inferences in favor of the non-moving, which we are. That is the interrogatory response, the unrebutted letter that's found at Joint Appendix Pages 83 and 84. They have challenged the letter sort of from a credibility standpoint, but they've not rebutted it as a matter of fact. The fact that an application, which on its face, no, this is the other letter. This is the letter from 2011, which the appellees have said, look, that was written after the permit was issued, that was written by an employee of an affiliated entity, and you shouldn't give it any weight. But that's different than saying the facts of the letter are not right. That would have been, I think, the best attack on that. The third is the inference that can be drawn that an application, which again on its- The problem with this whole position is, you know, how can DMME and the permitting agency be charged with knowledge while you simultaneously plead ignorance of what's going on in the outflows at your own mine site, which you never bothered to sample? Now, you know, if we approve all of that, I can't tell you how much havoc it would cause. And we would really be dealing a severe blow to the Clean Water Act and the permitting process. We'd be saying, you don't need to disclose it. You can go ahead and discharge it. Put all the blame on the agency. Don't worry about sampling. I mean, it just- I'll follow up on my good colleague's question. The Department of Justice brief here, it's technical in some ways. But in other ways, it's very clear. This case represents a thrust at the heart of this piece of legislation. It just goes after the whole undergirding and underpinning of the permitting process. May I respond, Your Honor? Yes. Yes, sir. Your Honor, the United States brief has provided what I'll call the 36,000-foot overview of the permit shield and the fact that it exists and that some disclosures are required in order for it to be invoked. But it's the state agency that is charged and vested by the United States with implementing the specific disclosure requirements. They're the ones who have the interaction with the applicant. They're the ones who enforce what the disclosure requirements are. And I would submit to the court, in a case of what I think is first impression and of this importance, I mean, this court asked the United States to tell them its views. I would suggest respectfully we could ask the state agency to file an amicus brief expressing what its views are because they're the ones without a seat at the table right now. It is a federal statute. It is with delegation to the state agency as to the particular disclosure issue we're talking about. There are delegated authority, but it is still a federal statute. Anyway, you have rebuttal time. Thank you. May it please the court and counsel. My name is Derek Teeney. I'm joined here by Isaac Howell at the counsel's table. Together we represent the plaintiffs below, the appellees in this matter, commonly referred to as SAMs, I believe, in the briefing. So if that slips out, that's what I'm referring to. Could you put that down just a little bit there? Absolutely, Your Honor. A little shorter than previous counsel. What counsel for ANG asks this court to do, it appears quite clear, is to overrule Piney Run because as the United States pointed out, the Piney Run decision sets out a two-prong conjunctive requirement to avail oneself of the permit shield. One is, prong one is adequate disclosure by the applicant. That's first because it's primary that the applicant is the one who has all the information available to them. And two, the second prong is the reasonable contemplation by the permitting authority. Why would that be conjunctive? If the applicant has disclosed it, would there be any need for the second prong? I appreciate that point because I think once the absent complete negligence and dereliction of duty by the regulatory authority, if the applicant were to identify a pollutant in its application, that would put it within the reasonable contemplation of the permitting authority. I was just assuming though, it seems like unusual circumstances, but I guess it could happen. The applicant sends their application in for the permit. It doesn't identify whatever the pollutant is. In this case, it's saline. And the letter comes back from the agency and says, we got your application. By the way, we also know there's saline in there. Why isn't that sufficient? Something in the application must have triggered that reasonable contemplation. And this gets at... Why not? I mean, if the agency knows it, and they say that, admittedly that's probably going to be a rare case. Why isn't that sufficient to satisfy a piling run? Because the EPA has stated in its policy guidance and also in the preamble that it believes that the burden lies on the applicant to comply. And in fact, the statute that we're talking about here, section 402K of the Clean Water Act... That just doesn't seem to make any sense to me now in the hypothetical I gave you. Because the agency has definitively said, we know this exists there. They've told the applicant that. I'm not understanding why that's not sufficient. Well, I think the only possible way in that hypothetical that the permitting authority would have contemplated it is there was something else about the application that constituted adequate disclosure besides the calling out of a pollutant by name. And even EPA's guidance allows for the scenario that's not this case, where if you identify a waste stream, for example, in the Ketchikan Pulp administrative decision... One of the issues was they told them, we operate a bleach plant. When you tell the permitting authority, hey, I operate a bleach plant, you don't necessarily have to say that chlorine is going to be an element of my discharge. It is a constituent of that waste stream. It's absolutely known. It's uniform. Everybody knows that's going to happen. That seems inconsistent with your requirement, this conjunctive test, which requires disclosure in the first instance. Right. And in that case, the disclosure... An implicit disclosure? Yes. It is the disclosure of the waste stream. And that gives some meaning to what ANG has referred to as prong three of the policy guidance, where EPA has said that pollutants that are known constituents of waste streams that are adequately disclosed. So there would be a way... You have to keep in mind there are, as the case law and the decision set out, thousands of possible pollutants, such that if you identify a waste stream that has known uniform characteristics, that if you simply say bleach plant, everybody knows that X, Y, and Z are going to be there, that would be adequate disclosure. But that's not this case. And the reason for that is selenium is not one of the thousand ordinary pollutants that may or may not be found somewhere. It is a toxic pollutant that EPA has called out for special treatment in the application process.  And you have an existing discharge. You need to provide quantitative data on these toxic pollutants. The pollutant at issue here is one of those. It is selenium. They are required by the regulations. They are required by the permit application instructions to provide quantitative data of selenium. And when they failed to do that, they failed to satisfy the test this court set out in Piney Run. So at least reasonable contemplation would never be relevant for this particular pollutant given those requirements. Is that your point? Absent a compliance with the disclosure requirement. If they complied with the disclosure requirements, then you move on to prong two. But if you fail to comply with the disclosure requirements, you don't get to prong two. And that's grounded in the statute, in the shield itself. Because remember, this is in the Clean Water Act, section 402K provides that compliance with a permit issued pursuant to this section shall be deemed compliance for purposes. And section 301A, which is the provision that we're enforcing here, says that the discharge of a pollutant shall be unlawful except in compliance with section 402. These application instructions, the disclosure requirements, come from section 402. And so therefore, to even get into the shield, you have to have first complied with 402. And that's why, even though it may seem like maybe there could be some hypotheticals where there's redundancy between the two prongs, it's required by the statute because the statute requires compliance, both in section 301 and in section 402. To address... A permit shield, by its very terms, refers to something that is protected by the permit itself. And how, just looking at the terminology of it, can you invoke a defense of a permit shield when there's been no disclosure, no listing in the permit? You're invoking a permit shield for something that hasn't been disclosed and that hasn't been permitted. I think that's absolutely right, Your Honor. And that's why it is a predicate threshold, and I think it's articulated well in the United States brief. I think it's also very clear in the EPA policy guidance from 1995, which is, of course, the basis of the Ketchikan pulp decision. And the Ketchikan pulp decision, of course, was EPA's interpretation of the permit shield to which this Court gave Chevron deference in Piney Run. And so that is the law of this circuit. And the policy guidance makes clear, before it talks out about the scope of the permit shield, it says, look, first things first, you have to comply with the disclosure requirements and any other information requests by the agency. If you don't have compliance, then we're not even going to talk about what you're actually allowed to discharge. And that makes sense based on the language of the statute. And you say selenium is... I mean, there could be disclosure when a pollutant with well-known constituent parts, and the overall pollutant is disclosed, but you wouldn't have to necessarily disclose all of the different constituent parts. Is that correct? I think that's right. That could still count as disclosure. You don't want to get unreasonable about it and say, no, you have to have a chemical breakdown of everything within it. Because I understand your position from the beginning. It's been that selenium is not that. That's absolutely right. And it's not that for a number of reasons. Number one, it's been called out for special treatment by EPA in Table 3 of Appendix D to the application instructions. There's a list of toxics, toxic metals, cyanide, phenols, that EPA says, look, all of you people discharging, we want to know if this is there and how much. It's not that hard to do, is it? No, it absolutely is not. It's done regularly and on a routine basis. How many companies are disclosing selenium? In the course of the permit process, selenium is disclosed routinely? I believe that the regulations would require every manufacturing, industrial, mining, silviculture facility, upon renewal, to take a sample at each outfall and quantify the selenium concentration. So it's happening every day across this country. You mean it's happening all across the country that selenium is being disclosed? Every day, yes, sir. This is not something that's shrouded in obscurity? No, and it's not a difficult thing to sample for or to test. So to that extent, it is puzzling why these application requirements weren't met in this case, but the fact is they were not. Did they submit some sort of supplemental application with the disclosure? I mean, what happens going forward? Can you have an amendment or modification of the permit? Permit modifications are absolutely permissible under the Clean Water Act scheme, either at the insistence of the permitting authority, or an outside entity can petition for a modification, or the applicant can apply to modify it. The question is why hasn't that been done? Well, that was what we sought and asked the court to order ANG to do, was to apply to modify its permit, submit the selenium data, and obtain a permit to discharge, presumably with limits. Once they apply, yes, they would have a permit shield at that point, but at this point, what we're looking for, we say, until you get that permit, you are in violation of Section 301 of the Clean Water Act, which requires you to either stop discharging selenium or get a permit for it. And we want them to get a permit for it, and at that point, there will be limits in place on the amount of selenium that they can discharge, and in that way it will protect the streams that are receiving currently this toxic pollutant without regulation and without monitoring. To briefly address ANG counsel's point about the application instructions and to the second phrase, and yes, this is at, I believe it's at 356 of the joint appendix. This is the application instruction that we maintain requires ANG to submit quantitative data on how much selenium is going to be in their effluent. And this requirement appears in the application instructions because of the regulatory requirements in both the federal and state regulations that require quantitative data. The permit application says that the applicant report at least one analysis for each pollutant. Please attach a certificate analysis or reference appropriate information on file at the division. So it would appear to give the applicant a choice to either, attached to its permit application, an analysis of the effluent, or to say DMME submitted this information that you're seeking on X date, and you will find it in your files. Now, neither of those is present in ANG's application. So for ANG to suggest that this final phrase somehow exonerates them from their otherwise complete failure to comply with the application instructions is not accurate because they never referenced appropriate information on file at the division of mining. To the extent that ANG asks the court to give some deference to the state agency, I think the case law is very clear that the Clean Water Act is a federal statute. Yes, it has the cooperative federalism elements in that the state agencies can receive delegated authority, but the case law is clear that when it comes time to interpret what the statute means, it is the federal agency who receives deference, not the state agency. Do you have anything further? If I might just have one moment. I don't believe that I do, indeed. Well, let me ask my co-panelists if they have any. Certainly. We don't have any further questions. Well, I thank the court very much for its time. Thank you. Mr. Dudley, happy to hear from you. Thank you, sir. May it please the court, once again, the approach taken by the district court and the United States and SAMS I believe would require a reversal of Piney Ryan because they said it's a requirement, it's got to be in the application. They've said it three times, and that's not what Piney Ryan stands for. So I would submit that that which took place in the district court did occur in the context of that misapplication of Piney Ryan, that it need not be in the application itself, if the pollutant need not be in the application itself. There is evidence in the record that A&G did comply with adequate disclosures regarding its waste streams and operations that would fit under prong three of the EPA 1995 policy statement regarding the permit shield. And that is found on pages 330, I believe, of the joint appendix. And prong three of the permit shield says a permit shield is protected as a pollutant not identified as present but which are constituents of waste streams, operations, or processes that are clearly identified. We clearly identified our waste streams, our processes, so forth and so on, and I would submit that therefore under prong three a pollutant not identified as present, that's what the problem is, that selenium was not identified as present. So if prong three permit shield means anything, it would capture those pollutants not identified as present in the application itself, but when you clearly identify for the benefit of the experts, the permitting agency, what your waste streams and operations are. And that's where prong three fits under this analysis. I would also sort of restate that this would be a factual determination. And if you rest now, I think you've got two choices, rule in our favor, rule in their favor. And if you rule in their favor, you're setting up a legal construct that would be extremely burdensome to have to list everything, everything in your written application before the agency. If you reverse and send it back to the trial court for further development at trial of the facts, what did the permitting agency have in its reasonable contemplation? By the way, we were not past the deadline to notify who our witnesses were going to be. The problem with what you just said to me is you've taken an omnibus phrase in the EPA guidelines and in the permitting application. And you say, well, we can list one or two specifics, and then we can have some open-ended or general discussion of a process. We don't have to actually list actual pollutants, even though they're listed pollutants within the appropriate regulations and permitting applications, and that we're going to rely on the agency expertise to ferret out unlisted pollutants simply because of general information that's been given about processes. And, you know, once again, it seems to me that that just, you go sufficiently far with that, and it simply turns the statute on its head. We're not dealing with an obscure pollutant. We're not dealing with a constituent part. Selenium is well known as among those pollutants that pose dangers to aquatic environments and to the cleanliness of water and to the safety of water. It's not some obscure thing. And, Your Honor, you're right. It is listed as one of those 15 elements for which the application is silent to, and yet the permitting agency granted the permit, and that is because there is a process in place that involves more than just the application. The application also has other requirements that you do not see technically complied with on the face. You're supposed to attach a notice that is going to go in the paper advertising about your permit. That's not attached to this application, but I think we can infer for summary judgment purposes that a notice took place. You're supposed to draw a line that indicates the flow of water, and that's supposed to be depicted in your application because of the instructions. That's not in the application in the Joint Appendix, but I think we can infer that that line was drawn somewhere along the way because the permitting agency granted the permit. Likewise, under Section 8, where it says tell me specifics about these 15 different elements, and it's silent as to that, and yet the permit was granted, I think we can infer that that is because there is an understanding by the experts, the permitting agency, what is taking place with respect to those 15 different, as you say, important pieces of information. Thank you. We'd like to come down and greet counsel here and then go into our final case.
judges: J. Harvie Wilkinson III, G. Steven Agee, Albert Diaz